UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOOMERANG SYSTEMS, INC., BOOMERANG SUB, INC., BOOMERANG USA CORP. and BOOMERANG MP HOLDINGS, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> PARKING SOURCE LLC, HARVEY HERNANDEZ and JESUS QUINTERO, <br><br> Defendants. | **COMPLAINT** <br><br> 15 Civ. 6524 <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Boomerang Systems, Inc., Boomerang Sub, Inc., Boomerang USA Corp. and Boomerang MP Holdings, Inc. (collectively, "Boomerang" or "Plaintiffs"), by their attorneys, Berg & Androphy, as and for their complaint against defendants Parking Source LLC ("Parking Source"), Harvey Hernandez ("Hernandez") and Jesus Quintero ("Quintero," and with Parking Source and Hernandez, "Defendants") state and allege as follows:

**Preliminary Statement**

1.      This is an action for breach of contract arising out of Defendants' intentional and malicious effort to cripple Boomerang's operations by denying Boomerang critical financing.  Because of Defendants' misconduct, Boomerang has been forced to seek bankruptcy protection and has thereby suffered significantly in its efforts to grow its technology-driven business.

2.     Boomerang is at the forefront of the automated parking system ("APS") market, with its robotic parking technology, RoboticValet®.  RoboticValet® is a low-profile, omni-directional robot that carries vehicles parked on steel trays to and from spaces by "driving" them directly on a concrete slab without use of a rack, rail or track. RoboticValet® provides unique advantages over other conventional parking solutions, including using half the space of human-parked garages, eliminating the danger to humans as none may enter the garage while it is in operation, and greatly reducing accidental property damage and theft.  RoboticValet® also provides certain environmental advantages, such as decreasing vehicular emissions (since vehicles are not driven around a garage) and eliminating the electrical lighting required by conventional systems.

3.     Because of, among other things, the cutting-edge technology necessary for its operations, Boomerang has entered into financing arrangements that guarantee it necessary cash flow.  Pursuant to a Loan and Security Agreement, dated June 6, 2013 (with all amendments thereto, the "LSA"), Defendants agreed to provide periodic financing, upon demand, to Boomerang for its operations and understood that such financing was essential to Boomerang's operations.  Indeed, the LSA was designed to provide Boomerang with a series of regular "Advances" from the Defendants and other lenders ("Lenders") as it expanded its operations, entered new contracts and marketed RoboticValet® to real estate developers and other potential customers.  Defendants are the primary Lender under the LSA, representing over 63 percent of the original LSA funding amount.  (A copy of the LSA is attached hereto as Exhibit A; a copy of the First

Amendment to the LSA is attached hereto as Exhibit B; a copy of the Second

Amendment to the LSA is attached hereto as Exhibit C; a copy of the Third Amendment

to the LSA is attached hereto as Exhibit D; a copy of the Fourth Amendment to the LSA

is attached hereto as Exhibit E.)

4.       By various amendments to the LSA, the financing provided by the LSA

("Facility") was increased from the original $4.75 million to $14.95 million.  The Third

Amendment, dated as of December 24, 2014, increased Defendants' commitment from

$3 million to $4.6 million, and thus, obligated Defendants to provide Boomerang with an

additional $1.6 million in financing upon request.

5.       Despite Defendants' knowledge of Boomerang's operations and financing

needs – and despite their unambiguous contractual obligations under the LSA –

beginning in April 2015, Defendants repeatedly refused to provide any additional

financing to Boomerang.  In fact, at a critical moment in July 2015, when Boomerang

was on the cusp of closing a new round of investor capital that would have provided

much needed liquidity to Boomerang's expanding operations (the "PIPE Transaction"),

Hernandez, on behalf of Defendants, flatly refused to finance, telling Boomerang that

Defendants knew that their default would very likely cause Boomerang to "go out of

business."   Since then, Hernandez has tried to usurp Boomerang's business by

attempting to hire away Boomerang's employees and commandeer its technology.

6.       Boomerang has been provided with no legitimate reason for Defendants'

refusal to fund; indeed, Hernandez, the managing member of Parking Source, has simply

stated that he and Quintero, the only other member of Parking Source, would not fund because they simply did not want to fund.

7.      Because of Defendants' refusal to abide by their obligations under the LSA and the Third Amendment, Boomerang has run out of cash and has filed for protection under chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

8.      As they are acutely aware, Defendants have severely injured Boomerang's business and reputation and caused Boomerang's bankruptcy filing.  In light of their bad faith and intentional and malicious breach of the LSA, Defendants are liable to Boomerang for all damages and losses reasonably foreseeable from that breach, including, but not limited to, all lost investments, contracts, business opportunities and/or profits, in an amount to be determined at trial, but not less than $25 million.

## PARTIES

9.      Plaintiff Boomerang Systems, Inc. is a corporation organized under the laws of Delaware with its principal place of business in New Jersey, and is the direct parent company and 100 percent owner of Plaintiffs Boomerang Sub, Inc., Boomerang USA Corp. and Boomerang MP Holdings, Inc.

10.     Plaintiff Boomerang Sub, Inc. is a corporation organized under the laws of Delaware with its principal place of business in New Jersey.

11.     Plaintiff Boomerang USA Corp. is a corporation organized under the laws of Delaware with its principal place of business in New Jersey.

12.     Plaintiff Boomerang MP Holdings, Inc. is a corporation organized under the laws of New Jersey with its principal place of business in New Jersey.

13.     Defendant Parking Source is a Florida limited liability company with its principal place of business in Florida.

14.     Defendant Hernandez is a resident of Florida and the managing member of Parking Source.  Along with Quintero, Hernandez exercises complete dominion and control over Parking Source and makes all decisions regarding Parking Source's levels of capitalization.  Hernandez is also the Chairman and CEO of Newgard Development Group Inc. ("Newgard"), is the manager and a member of Brickell House Holding, LLC ("BHH") and the President of BrickellHouse Condominium Association, Inc. ("BCA").

15.     Defendant Quintero is a resident of Florida and/or Venezuela and the only other member of Parking Source.  Along with Hernandez, Quintero exercises complete dominion and control over Parking Source and makes all decisions regarding Parking Source's levels of capitalization.  Quintero is also a member of BHH and, at all relevant times, has been a director of Newgard.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) as there is complete diversity among the parties and the amount in controversy exceeds $75,000.

17.     Venue is proper in this district because Section 16.1 of the LSA expressly provides for jurisdiction in this Court for all disputes arising out of, or related to, the LSA.

5

## FACTUAL ALLEGATIONS

### I.   Defendants' Involvement In The Facility

#### A.   The LSA

18.   On or about June 6, 2013, Boomerang, as borrower, entered into the LSA with a group of Lenders, including Parking Source.  Under those terms, the Lenders initially agreed to provide up to $4.75 million in financing to Boomerang, which was available to Boomerang upon its request (the "Advances").  Over 60 financiers participated in the Facility as Lenders, with Defendants having the greatest original participation, approximately 63 percent.  Parking Source also served as Agent under the Facility.

19.   For participating in the LSA, each of the Lenders, including Parking Source, received warrants to purchase common stock in Boomerang.

20.   The LSA was subsequently amended four times to ultimately increase the Facility to $14.95 million.  The Third Amendment expressly increased Defendants' commitment from $3 million to $4.6 million, $1.6 million of which was due and owing upon Boomerang's request.

21.   Article II of the LSA sets forth the processes by which Boomerang is to request an Advance under the LSA, and for the Lenders, including Defendants, to make such Advances to Boomerang.  Each Lenders' actual Advance is determined by the amount of the entire requested Advance multiplied by that Lenders' "Commitment Percentage."

22.    Critically, Section 2.9(b) of the LSA makes clear that if any Lender defaults on a request for an Advance, Boomerang cannot seek the defaulted Advance amount from the other Lenders under the LSA.  Thus, when one Lender responsible for a significant portion of the Facility, like Defendants here, wrongfully refuses to perform under the LSA, the impact on Boomerang can be, and ultimately was, disastrous.

### B.    The Brickell Garage

23.    Prior to the execution of the LSA, Defendants, through Newgard and BHH, had contracted with Boomerang for the construction of a RoboticValet® APS (the "Brickell Garage") at the BrickellHouse condominium complex, located at 1300 Brickell Bay Drive, Miami, Florida.  Opened in October 2014, the Brickell Garage uses RoboticValet® to park vehicles and has received significant press coverage and other publicity in the Miami area.  The Brickell Garage can currently park over two hundred cars.

24.    Through the construction of the Brickell Garage, Defendants became acutely aware of the nature of Boomerang's business, such as the cutting-edge robotics, hardware and software that comprise the RoboticValet® system, as well as the capital-intensive development, technological and labor costs associated with Boomerang's operations.  Indeed, Defendants have learned more about Boomerang, and its business and operations, than any other third party.

25.    Accordingly, when Boomerang was considering a new financing facility in 2013, which culminated in the LSA, it was natural for Boomerang to seek participation from Defendants.  As noted, Defendants not only agreed to participate, they agreed to the

7

largest Commitment Percentage of the various Lenders, and further agreed to serve as Agent for the Facility.

### C.    The PIPE Transaction

26.    In the first half of 2015, Boomerang launched another significant new financing for its operations:  a solicitation for private investment in the public equity of Boomerang, or what is otherwise known as a "PIPE" financing (*i.e.*, the PIPE Transaction).  Through the PIPE Transaction, Boomerang anticipated raising another $10-15 million in needed capital for its operations by no later than September 2015.

27.    Defendants were fully aware of the PIPE Transaction and knew just how important it was to Boomerang's business.  By April 2015, Boomerang was in an exciting position:  (a) it had completed its first large-scale RoboticValet® APS, the Brickell Garage; (b) it had three ongoing contracts around the country to build and install additional RoboticValet® APSs; and (c) because of the popularity of the Brickell Garage, Boomerang had received a number of communications from other real estate developers interested in RoboticValet® for their projects.  This same excitement was also driving investor interest in the PIPE Transaction as new investors in Boomerang could see the success of the Brickell Garage and a number of new contracts and prospects in the pipeline.

### D.    The April Advance

28.    Despite knowing that Boomerang was at this critical juncture, Defendants nevertheless breached their obligation to provide requested funding under the LSA.  On or about April 14, 2015, Boomerang requested an Advance (the "April Advance") from

the Lenders under the LSA in the sum of $4.9 million, $1.6 million of which was the obligation of Defendants under the Third Amendment.  As required by Sections 2.2 and 2.8 of the LSA, Boomerang requested the April Advance by sending a written notice to Parking Source, as Agent for the Facility, containing the amount requested and a description of the use of proceeds.  Parking Source, as Agent, communicated this requested April Advance to the Lenders, *and every Lender other than Parking Source provided Boomerang with their committed amount in a timely fashion.*

29.     Defendants, however, did not abide by their promise and failed to provide their committed amount of the April Advance.  However, Defendants had been late in funding before, so between April and July 2015, Boomerang employees repeatedly contacted Hernandez and requested that Defendants abide by their obligation to fund the April Advance.  Hernandez responded to these repeated requests with excuses for Defendants' delay and promises that Defendants would fund the $1.6 million.

30.     Eventually, Defendants also requested that Boomerang find a new investor to step in and buy out Defendants' $1.6 million obligation.  However, Boomerang was unable to find an investor who was willing to do so before the PIPE Transaction closed and so advised Defendants, again demanding that Defendants comply with their obligation to fund the $1.6 million.

### E.     **Defendants' Breach And Refusal To Fund**

31.     By July 2015, the situation had become critical.  In or about July 2015, Boomerang representatives again explained to Hernandez that the $1.6 million was needed for Boomerang to continue to operate.  However, for the first time since

Boomerang requested the April Advance, Hernandez, on behalf Defendants, unconditionally refused to fund.

32.     On July 22, 2015, James Gelly ("Gelly"), Boomerang's CEO, sent Defendants an email in which he reiterated the need for Defendants' funding and stated: "[w]ithout Parking Source's funding, Boomerang will not have sufficient liquidity to continue operations and will have to enter some form of bankruptcy process.  Such an outcome would unfavorably impact the normal operation of the company, including the completion and/or operation of BrickellHouse and the three subsequent RoboticValet garages currently under contract."

33.     The next day, on July 23, 2015, Mark Patterson, Boomerang's Chairman of the Board, sent the following email to Hernandez:  "I implore you and Jesus [Quintero] not to allow a [Boomerang bankruptcy] to happen.  Catastrophic for you and us in so many ways.  We have been working tirelessly for months and have a path to success, but only if you fund.  We are so close to achieving our collective objectives."

34.     Defendants still refused to fund, re-stating their intent to default under the LSA.  In fact, Hernandez told Gelly that he knew Defendants' default would likely cause Boomerang to file for bankruptcy and then buyers would step in and purchase Boomerang "for ten cents on the dollar."  Hernandez further told Gelly that he would simply arrange for alternative parking facilities that would step in if the Brickell Garage were forced to close when Boomerang filed for bankruptcy.

35.     In the end, Defendants strategically refused to provide critical financing to Boomerang at the most crucial point in its operational history.

36.     Because of Defendants' breach, and as Defendants anticipated, Boomerang was forced to begin a shutdown of its operations.  Upon learning of Boomerang's need to shut down, Hernandez immediately tried to hire away Boomerang's employees in the Brickell Garage, telling them that he had "plenty of money."  Hernandez proposed to pay these employees to run the Brickell Garage without Boomerang support – a decidedly dangerous proposition given the heavy, automated and incredibly complex machinery that makes up the core of the Garage.  Upon information and belief, Hernandez has also tried to contact and make arrangements with Boomerang's vendors.

37.     Boomerang also provided written notice to Hernandez, BHH and BCA that, because of Defendants' default, Boomerang could no longer provide services at the Brickell Garage and would arrange for the safe and orderly release of vehicles from the Garage.  Upon receipt of such notice, Hernandez physically entered the Garage and began harassing Boomerang employees and directing them to disobey Boomerang's instructions, creating an imminently unsafe and unstable situation at the Garage.  When Boomerang employees left Brickell Garage – as a direct result of Hernandez' harassment – Hernandez attempted to run the Garage without their assistance.

38.     With their knowledge of, and experience with, Boomerang and RoboticValet®, Defendants knew that their actions would have a devastating impact on Boomerang and would end any hope that Boomerang could continue to operate – outside of bankruptcy – until the PIPE Transaction could close.  Indeed, Hernandez seemed to relish the idea that Defendants' conduct would cause Boomerang to file for bankruptcy protection.  All of these events, orchestrated by Defendants, have now come to pass.

11

**II.**     <u>**Defendants Have Caused Significant Losses To Boomerang**</u>

39.     Because of Defendants' conduct, Boomerang has lost, among other things, the tremendous value of the PIPE Transaction and several additional APS contracts.  In addition to the Brickell Garage, Boomerang has been compelled to cease providing services at another, in-progress RoboticValet® project in Champaign, Illinois. Boomerang has also had to cease work on two additional contracts to install RoboticValet® systems at locations in Lawrence, Kansas and Hollywood, Florida. Finally, as Defendants planned, Boomerang has had to file for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware.

40.     All of these losses were reasonably foreseeable consequences of Defendants' intentional and outrageous misconduct.  Accordingly, Defendants are liable to Boomerang for these losses, which exceed $25 million.

<u>**FIRST CAUSE OF ACTION**</u>

**Breach of Contract**

**(Against Parking Source)**

41.     Boomerang incorporates by reference the allegations set forth in paragraphs 1 through 40 of this Complaint as though set forth fully herein.

42.     Parking Source has breached its obligations under the LSA by refusing to provide Boomerang its committed amount of the April Advance.  Parking Source has provided no contractually-based reason for this failure to fund, and all other Lenders have provided their share of the April Advance.

12

43.    Parking Source has acted intentionally, in bad faith and with reckless indifference to Boomerang's rights under the LSA.

44.    Boomerang has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the LSA.

45.    For these reasons, Boomerang is entitled to a judgment for damages against Parking Source for all losses arising from Parking Source's breach of the LSA in an amount to be determined at trial, but in excess of $25 million.

## SECOND CAUSE OF ACTION

### Breach of Contract

### (Against Hernandez and Quintero)

46.    Boomerang incorporates by reference the allegations set forth in paragraphs 1 through 45 of this Complaint as though set forth fully herein.

47.    As Defendants have conceded, Hernandez and Quintero are the only members of Parking Source and exercise complete dominion and control over Parking Source, including all decisions regarding payments made by, and the levels of capitalization for, Parking Source.  Hernandez and Quintero further exert their domination over Parking Source so as to dictate all of its business decisions, practices and policies, including whether to honor its obligations under the LSA.  Parking Source is a mere shell, and thus the alter ego of Hernandez and Quintero, who caused Parking Source to breach the LSA for their own personal benefit.

48.    Hernandez and Quintero used their dominion and control over Parking Source to deprive Parking Source of necessary capital and to leave it undercapitalized

and unable to meet its contractual obligations.  Further, acting intentionally, in bad faith and with reckless indifference to Boomerang's rights under the LSA, Hernandez and Quintero compelled Parking Source not to fund its $1.6 million commitment, in breach of the LSA, all for the sole benefit of Hernandez and Quintero.

49.    Indeed, the only beneficiaries of Parking Source's breach were Hernandez and Quintero who – admittedly – forced Parking Source to breach so that they would not have to provide further capitalization to Parking Source.

50.    Accordingly, Hernandez and Quintero – for their misuse and abuse of their dominion and control over Parking Source – are now personally liable for Parking Source's breach of the LSA and the resulting injuries to Boomerang.

51.    Boomerang has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the LSA.

52.    For these reasons, Boomerang is entitled to a judgment for damages against Hernandez and Quintero, jointly and severally, for all losses arising from Parking Source's breach of the LSA in an amount to be determined at trial, but in excess of $25 million.

## PRAYER FOR RELIEF

WHEREFORE, judgment should be entered in favor of Plaintiffs and against Defendants as follows:

(a)    On the first cause of action, an award of damages against Parking Source in an amount to be determined at trial, but in excess of $25 million;

(b)     On the second cause of action, an award of damages against Hernandez and Quintero, jointly and severally, in an amount to be determined at trial, but in excess of $25 million;

(c)     For prejudgment interest at the maximum legal rate; and

(d)     For any such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury of all issues in this action that are triable to a jury.


Dated:  New York, New York
         August 18, 2015
.

                                                Respectfully submitted,

                                                BERG & ANDROPHY

                                                By:   /s/ Jenny H. Kim

                                                    Michael M. Fay (mfay@bafirm.com)
                                                      Jenny H. Kim (jkim@bafirm.com)
                                                      Chris L. Sprengle (csprengle@bafirm.com)
                                                      120 West 45th Street, 38th Floor
                                                    New York, NY  10036
                                                    Tel: (646) 766-0073
                                                    Fax: (646) 219-1977

                                                    *Attorneys for Plaintiffs*